David FINKELSTEIN, Appellant,

v.

Sandra STOUT, Director of the Alaska Division of Elections, and Stephen A. McAlpine, Lieutenant Governor of Alaska, Appellees,

and

W.E. "Brad" Bradley, Intervenor.

No. S–3107.

Supreme Court of Alaska.

Jan. 11, 1989.

Joseph McKinnon, Don Clocksin, Wagstaff, Pope & Clocksin, Anchorage, for Finkelstein.

Jonathan B. Rubini, Sp. Counsel for State, Juneau, Grace Berg Schaible, Atty. Gen. for the State of Alaska, Juneau, for Sandra Stout, et al.

David A. Devine, Robinson, Devine & Holliday, Anchorage, for Bradley.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON, and MOORE, JJ.

## ORDER

### I. INTRODUCTION

This is an election recount appeal brought pursuant to AS 15.20.510(2). This court referred the appeal to the Honorable Joan M. Katz of the Superior Court as a Special Master on December 8, 1988. Judge Katz filed her report on January 5, 1989. The report contains a detailed analysis of the challenges from all parties and of the evidence submitted in connection with the challenges.[1] The following introduction contained in the report sets the context of this case:

> In the general election of November 8, 1988, David Finkelstein and W.E. "Brad" Bradley vied for Seat A in House District 13. After the election, Finkelstein was certified by appellee Stout, Director of the Division of Elections, to be the winner of that race. The count was 3,549 to 3,546.

> At Bradley's request, a recount was conducted on December 1 and 2, 1988. Based on the recount, Stout certified that Bradley had defeated Finkelstein 3,563 to 3,554, a nine vote margin.

> In the course of the recount, Stout determined that 26 votes had been improperly counted. Finkelstein Ex. 1. The ballots had been commingled, rendering it impossible to ascertain for whom they had been cast. Based on the formula set forth in *Hammond v. Hickel*, 588 P.2d 256 (Alaska 1978), *cert. denied*, 441 U.S. 907, 99 S.Ct. 1998, 60 L.Ed.2d 376 (1979), Stout proportionately reduced Bradley's vote total by 15.02 votes and Finkelstein's total by 9.98 votes. These reductions resulted only in narrowing the gap between the candidates to 3.96 votes. Having determined that the outcome of the election would not have been different based on the rejected ballots, Stout certified the election results premised on the recount totals demonstrating Bradley to be the prevailing candidate by nine votes.

Judge Katz concluded that because of various errors relating to the counting of ballots, the election should be set aside and a new election held. As explained herein, we conclude that a new election may be necessary depending on the count of nine illegally cast absentee ballots which were not commingled[2] and on the precise proportionate reduction formula employed by the Director.[3] For ease of reference we will adopt the same numbering system and terminology employed in the Master's Report.

### II. SPECIFIC BALLOT CHALLENGES

#### A. *Appellant's Challenges*

##### 1. *Absentee ballot envelope oaths suggesting no permanent Alaskan residence*

■ Finkelstein challenged fourteen absentee ballots in this group. Judge Katz

---

1. We express our gratitude to Judge Katz for her thoughtful and expeditious report.

2. *See* infra part II.A.7.

3. *See* infra part II.B.3.

accepted the challenges in three cases and rejected the other eleven. A majority of the court is of the view that none of the challenges should have been accepted. There was sufficient evidence in each case so that the voter's intent to indicate a new legal residence outside of the district was unclear. In the absence of a clear expression of intent to change a legal residence the residence cannot be considered to have been changed. *See Fischer v. Stout*, 741 P.2d 217, 222–23 (Alaska 1987).

### 2. *Post-election affidavits demonstrating non-residency*

■ After the election and the recount, twenty-one voters signed registration affidavits stating that they were not residents of the district at the time of the election. The Director of Elections had counted the votes of these individuals and they have been commingled. Judge Katz declined to apply the proportionate reduction formula set out in *Hammond v. Hickel*, 588 P.2d 256, 260 (Alaska 1978), *cert. denied*, 441 U.S. 907, 99 S.Ct. 1998, 60 L.Ed.2d 376 (1979) to these votes. We agree with this conclusion. In our view, this objection was untimely as it was raised after the recount was concluded.

### 3. *Military post office box "residences"*

■ Eleven challenges were considered under this category. All of the challenges were rejected by Judge Katz. We concur.

### 4. *Absentee ballot lacking witness signature*

■ One challenge was made under this category which was accepted by Judge Katz. On the place for the signature of the witness, with respect to this absentee ballot, there is only a postmark, with no signature. We agree with Judge Katz that this ballot should not have been counted.

### 5. *Undated witness signatures*

■ Three individuals cast absentee ballots on which the attesting official did not date his or her signature. Judge Katz accepted these three challenges. We disagree. The attesting official witness is required to date his or her signature. AS 15.20.081(d). However, we have held that this requirement is directory rather than mandatory and does not require invalidation of the ballot so long as the ballot in question is cast on or before election day. *Hammond v. Hickel*, 588 P.2d 256, 269, (Alaska 1978) *cert. denied*, 441 U.S. 907, 99 S.Ct. 1998, 60 L.Ed.2d 376 (1979). The burden of proving ballot illegality in general and particularly that the ballot in question was not cast on or before election day is on the challenger. This burden was not carried as all three ballots were received by the Division of Elections prior to the election.

■ Alaska Statute 15.20.081(d) also requires voting in the presence of the attesting witness. While a majority of the court agrees with Judge Katz that this requirement is mandatory rather than directory, it is our view that Finkelstein did not carry his burden of showing a violation of this requirement.

### 6. *Incomplete voter signature*

■ One voter made a hand written mark which appears to be the beginning of a "K" in the voter signature blank of the voter oath on the back of the absentee ballot. A qualified attesting official witness attested that the oath was subscribed and sworn to before the witness. Judge Katz ruled that this was not a signature as required by AS 15.20.081(d). She thus accepted the challenge made by Finkelstein. We disagree. The mark could be legally sufficient to serve as the voter's signature if that was the voter's intent. *Fischer v. Stout*, 741 P.2d at 225. Since the voter oath was properly attested as subscribed and sworn to, it is the view of a majority of the court that it has not been shown that the mark was not intended by the voter to serve as his signature.

### 7. *Different witness dates*

■ Thirty-two voters submitted absentee ballots which had been witnessed by two non-official witnesses on different dates. All of these votes were counted. However, the Division segregated nine of

the total so that if they were counted illegally the votes can be directly deducted. The remaining twenty-three votes have been commingled. Judge Katz ruled that all thirty-two of these votes were properly counted. We disagree for the reasons that follow.

a.

Alaska Statute 15.20.081(d) sets out the procedures for voting absentee by mail. In relevant part, that section provides:

Upon receipt of an absentee ballot by mail, the voter, in the presence of [an official] ... may proceed to mark the ballot in secret, to place the ballot in the small envelope, to place the small envelope in the larger envelope, and to sign the voter's certificate on the back of the larger envelope in the presence of an official listed in this subsection who shall sign as attesting official and shall date the signature. If none of the officials listed in this subsection is reasonably accessible, an absentee voter shall have the ballot witnessed by two persons over the age of 18 years....

In *Fischer v. Stout,* we interpreted this section to mean that the two non-official witnesses must be present when the voter signs the voter's certificate. We stated:

AS 15.20.081(d) and 6 AAC 25.110(a) specify the classes of persons authorized to serve as an attesting officer. If no appropriate officer is available, the voter may sign the voter's certificate *in the presence of two persons* over the age of 18 years and have those two witnesses sign the attestation form.

741 P.2d at 223 (emphasis added, footnote omitted). Thus, we interpreted the statute to mean that the role of the two non-official witnesses was the same as the function of the attesting official witness set forth in the statute.

One purpose of this statute is to insure that the ballot was marked by the voter, and not someone else, in circumstances free from coercion. The Mississippi Supreme Court has said concerning a similar requirement:

The certificate..., in addition to certifying that the voter executed the affidavit, certifies the voter first exhibited a blank ballot which was not marked or voted before it was exhibited to the witness, and that the voter then retired out of the witness' presence but within his sight so that he could see that he voted but not how he voted, that no one was present as he marked his ballot, that the voter was not solicited or advised in voting, and, finally, that after making his ballot in secret, the voter placed it in the envelope, closed and sealed the envelope in the certifying officer's presence, and then signed and made affidavit to the first certificate.

It is thus clear that the Legislature intended both signatures to be on the envelope because there were subsequent requirements to best ensure the integrity of an absentee ballot.

*Fouche v. Ragland,* 424 So.2d 559, 561 (Miss.1982).

Since one objective is to insure that the voter mark his or her own ballot and that the vote be uncoerced, it would make no sense to require secret voting in the presence of an official, while waiving the presence requirement when two non-official witnesses are used.

The legislative history of the present statute, AS 15.20.081(d), confirms the view that the ballot is to be voted in the presence of either an attesting official or two non-official witnesses. Prior to 1980, the predecessor section to AS 15.20.081(d) required only one attesting witness, who need not be an official. The statute was, however, clear that voting had to take place in the presence of the attesting witness.[4]

4. The former statute, AS 15.20.150, read as follows:

CASTING VOTE BY PERSONAL REPRESENTATIVE OR BY MAIL. Upon receipt of an absentee ballot through a personal representative or by mail, the voter, whether in or outside the state, in the presence of an attesting witness who is at least 18 years of age, may proceed to mark the ballot in secret, to place the ballot in the small blank envelope, to place the small envelope in the larger envelope, and to sign the voter's certificate on

Following our decision in *Hammond v. Hickel* the legislature amended the statute, enacting AS 15.20.081(d) in its present form. The legislative committee memo accompanying the amendment said:

> Requires a person authorized to administer an oath to witness the signature on an absentee ballot. In the instance that a qualified official is not available, 2 persons may witness the signature.

Alaska State Senate, Special Committee on Electoral Reform, Document dated April 23, 1980 (section by section analysis). There are two conclusions to be drawn from this comment. The first is that there was no intent to change the requirement of voting in the presence of an attestor. Had there been such an intent it would have been mentioned. Second, the two non-official witnesses were regarded as a substitute for the attesting official witness, if one was not available. What was to occur before the attesting official witness or the two non-official witnesses was regarded as identical.

b.

Having established what the law requires, the next step is to determine whether it was complied with. In the case of the thirty-two ballots containing witness signatures subscribed on different dates, it can be said with a high degree of confidence that the voter did not mark the ballot, place it in the small envelope, place the small envelope in the larger envelope and sign the voter certificate on the back of the larger envelope in the presence of both non-official witnesses. If this had been done, the dates following the witnesses' signatures would be consistent. Thus, the certificates themselves rebut the presumption of regularity and demonstrate non-compliance with the law.

c.

■ The next question is whether the director properly counted these absentee ballots even though they were not cast in the presence of the non-official witnesses.

Alaska Statute 15.20.203 requires the district absentee counting board to examine each absentee ballot envelope to determine whether the absentee ballot has been properly cast. Part (b) of the statute provides as follows:

> An absentee ballot may not be counted if
>
> (1) the voter has failed to properly execute the certificate;
>
> (2) an official or the witnesses authorized by law to attest the voter's certificate fail to execute the certificate;
>
> (3) the ballot is not attested on or before the date of the election;
>
> (4) the ballot, if postmarked, is not postmarked on or before the date of the election; or
>
> (5) after the day of election, the ballot was delivered by a means other than mail.

The conditions set out in this statute are not exclusive. In *Willis v. Thomas*, 600 P.2d 1079, 1083 n. 9 (Alaska 1979), we quoted the following language from *Carr v. Thomas*, 586 P.2d 622, 626 (Alaska 1978), which in turn quoted *Rich v. Walker*, 237 Ark. 586, 374 S.W.2d 476, 478 (Ark.1964) as follows:

> All provisions of the election law are mandatory, if enforcement is sought before election in a direct proceeding for that purpose; but after election all should be held directory only, in support of the result, unless of a character to affect an obstruction to the free and intelligent casting of the vote or to the ascertainment of the result, or unless the provisions affect an essential element of the election, or unless it is expressly declared by the statute that the particular act is essential to the validity of an election, or that its omission shall render it void.

the back of the larger envelope in the presence of the above-listed official or described persons who shall sign as attesting witnesses. The voter may then return the ballot properly enclosed in the envelopes, by personal representative to the election official who provided the ballot or by the most expeditious mail service, postmarked not later than the day of the election, to the election supervisor in his district.

The requirement of voting in the presence of the non-official witness is, to use the terms of the language quoted above, "of a character to affect an obstruction to the free and intelligent casting of the vote ... or to ... affect an essential element of the election..." As noted earlier, AS 15.-20.081(d) is designed to insure that the vote cast is that of the elector and that it was cast in circumstances free from coercion. Moreover, this requirement protects the integrity of the ballot process itself. Noncompliance with the requirements of AS 15.20.081(d) risks the frustration of these fundamental principles.

In *Fischer v. Stout*, we noted that signing in the presence of the attestor was a condition of ballot validity: "AS 15.20.081(d) provides that an absentee ballot will be valid only if the ballot envelope is signed by the voter in the presence of an attesting officer." 741 P.2d at 223. This statement is dictum. It is, however, correct. Because the requirements of AS 15.20.-081(d) serve both to protect the essence of free and intelligent voting and to safeguard the integrity of the ballot process, the requirements should be regarded as mandatory.

*Desjourdy v. Board of Registrars*, 358 Mass. 664, 266 N.E.2d 672 (1971) is instructive. There twenty-two absentee ballots were not marked in the presence of a notary as required by Massachusetts law and the ballot envelopes were signed by notaries outside the presence of the voters. *Id.* 266 N.E.2d at 674, 677. The Supreme Judicial Court of Massachusetts held that these ballots should not have been counted:

> The procedure followed violated [the applicable statute], which sets up significant safeguards to insure that the ballot represents the will of the voter. Its violation results in more than simply a technical irregularity. As these ballots stand, we have no way of knowing whether they were in fact marked by those in whose names they were received and cast.

*Id.* at 677 (citations omitted).

*Kiehne v. Atwood*, 93 N.M. 657, 604 P.2d 133 (N.M.1979), is another case where a court invalidated ballots because of attestation illegality. There the oaths on seven absentee ballots were notarized by the county clerk. *Id.* at 132. The voters were not in the clerk's presence when they signed the documents. *Id.* All of the voters testified that they wanted the county clerk to notarize their signatures. *Id.* In invalidating the ballots, the court stated:

> [A]s to the affidavits in question, swearing to and subscribing by the voter and attesting to by a notary or other official are not mere technicalities. The statutes prescribing these duties are not simply directory. The acts called for are significant safeguards against fraud and mistake, are necessary to preserve the purity of our elections, and are mandatory duties.

*Id.* 604 P.2d at 133.

In *Fugate v. Mayor and City Council of Buffalo*, 348 P.2d 76 (Wyo.1959), twelve absentee ballot affidavit forms were attested to by an election official not in the presence of the affiants. *Id.* at 79. These votes were held to be illegal. *Id.*, at 85. *See also McCavitt v. Registrars of Voters*, 385 Mass. 833, 434 N.E.2d 620, 628 (1982) (ballots marked outside presence of notary held invalid).

The fact that the ballots in the present case were not cast in the presence of two non-official witnesses is due in part to the failure of the voter instructions on the voter oath form to state explicitly the requirement that the vote be cast in the presence of the witnesses. We have noted that errors "solely on the part of election officials" will not invalidate ballots. *Willis v. Thomas*, 600 P.2d at 1087 (registered voters' names not on voters' lists on election day). *See also Fischer v. Stout*, 741 P.2d at 223, 224. That observation, however, was not made where the official omission caused or contributed to a violation of a mandatory requirement, and we decline to extend it to such cases. A voter who has voted illegally has an interest in having his or her vote counted, and that interest stands on a high level where the source of the illegality lies with election officials. On the other hand, where the

vote violates provisions designed to insure the integrity of the electoral process, the public has a supervening interest—that of fundamentally sound elections—which is protected by not counting illegal votes, regardless of the source of their illegality.

### 8. *Ballots without postmarks received after the election*

Four challenges were made under this category, all of which were rejected by Judge Katz. We concur.

### 9. *Unregistered voter*

The state has conceded that the absentee ballot of the unregistered voter in question should not have been counted. Judge Katz concurred and accepted the challenge. We concur as well.

### 10. *Punchmark ballots*

 Involved here are challenges to fourteen votes for Bradley where the punchmarks were placed in the boxes for both Bradley and Finkelstein. Judge Katz accepted three of these challenges, namely to ballots 29, 20, and 30. Judge Katz was evidently under the impression that ballot 29 had been counted. We are advised by all counsel that in fact it was not counted and thus it should not be subtracted from Bradley's total. Ballots 20 and 30 were called by the Director for Bradley. Judge Katz, however, was of the view that the voters' intent could not be determined from the ballots. We disagree. In our view it is evident that the voting machine was voting low and that the voters in these cases intended to vote for Bradley.

A different situation exists with respect to ballot 27. Judge Katz recommended that this vote be attributed to Bradley. We disagree and accept Finkelstein's challenge. There is no consistent pattern on this ballot of the punchmarks being either high or low. The intent of the voter cannot be determined.

On all other ballots within this category we concur with the recommendations of Judge Katz which upheld the Director.

### B. *Intervenor's Challenges*
#### 1. *Absentee ballots lacking voter signatures*

Bradley contends that fifteen absentee ballots which were not counted because they were not signed should have been included. Judge Katz held that the Division was correct in refusing to include these ballots. We concur.

#### 2. *Special overseas absentee ballots*

 Three voters submitted special absentee ballots and later mailed regular absentee ballots which for various reasons were held invalid. Bradley argues that under these circumstances the original special ballots of these voters should have been counted. The Division disagreed and Judge Katz recommended that the decision of the Division be upheld. We concur.

#### 3. *Proportionate Formula*

 In order to determine whether the errors in counting commingled ballots might have affected the election, a proportionate formula was employed. *See Hammond v. Hickel*, 588 P.2d at 260. Bradley contends that the formula was not strictly proportional because it failed to include ballots which were cast for write-in candidates or which were blank with respect to the Finkelstein–Bradley race. We agree that the principle espoused by Bradley is correct. We are, however, uncertain as to what the precise ratio is which results from application of this principle. That should be determined by the Director on remand.

### III. CONCLUSION

The Director certified that Bradley had defeated Finkelstein by nine votes, 3,563 to 3,554. We have accepted one challenge which reduces Bradley's total to 3,562 votes (part II.A.10. of this order, ballot 27). There were fifty-one illegal ballots which were counted and commingled. (Twenty-six found by the Director, twenty-three in accord with part II.A.7. of this order, and one each for parts II.A.4. and II.A.9.) In addition, there were nine illegal ballots

which were counted but not commingled. (Part II.A.7.)

This case is REMANDED to the Director with the following instructions:

1. The nine segregated ballots should be deducted from the vote totals of the candidate for whom they were cast. A provisional prevailing candidate will then be apparent.

2. The appropriate proportional reduction formula should be applied to the fifty-one illegally counted commingled ballots.

3. If application of the proportional reduction formula does not change the provisional result noted in step 1, the Director should certify the prevailing candidate forthwith.

4. If application of the proportional reduction formula would change the provisional result achieved in step 1, a new election should be held promptly.

RABINOWITZ and MOORE, JJ., dissenting.

RABINOWITZ, Justice, joined by MOORE, Justice, dissenting.

I dissent from the court's holding that the Director improperly counted 32 absentee ballots which had been witnessed by lay persons on different dates. Thus, I would affirm the certification of the Director of the Division of Elections that W.E. "Brad" Bradley is the winner of the election for Seat A in House District 13.

This court's Special Master rejected the state's contention that the dating of lay witnesses' signatures is only directory. Instead the Special Master ruled that it is a mandatory aspect of absentee voting that lay witnesses be present when the ballot is cast and the voter certificate is executed. AS 15.20.081(d). The Special Master further reasoned that normally the failure to comply with a mandatory provision which has as its purpose establishing "presence" should prove fatal to these ballots. Nevertheless the Special Master concluded that the director properly counted these disputed absentee ballots. In so doing the Special Master reasoned as follows:

However, once again, the Division has utilized procedures, in this case forms, that are seriously deficient. Option 2 under the witnessing affidavit provides in full:

> If no authorized official is reasonably available, you may have the certificate witnessed by two persons over the age of 18.
>
> Witness _____ Signature_____
> Date_____
> Witness _____ Signature_____
> Date_____
>
> at (City/State or Country)_____

Finkelstein Ex. 147, p. 1. Unlike the official executing an affidavit under Option 1, the lay witnesses are not told what it is that they are to "witness." They may reasonably believe that it is sufficient if a person they know to be the individual whose name appears on the oath brings the certificates to them to sign, after the fact. Such an interpretation would be consistent with the type of certification required on permanent fund dividend application forms.

While the witness' certificate is simply unclear, the instructions to the voter on the secrecy envelope are actually misleading. The voter is directed to take certain steps. The first four are summarized below. The fifth step is quoted as it appears in the instructions.

[1. & 2. Mark the ballot.]

[3. Turn the ballot over and vote the other side.]

[4. After all choices have been marked, put the ballots in the secrecy envelope.]

5. *Complete and sign the VOTER OATH* on the back of the return mailing envelope. Also have your oath WITNESSED, using OPTION 1 or OPTION 2 described on the back of the return mailing envelope.

Two additional steps regarding mailing follow.

These instruction suggest that the voting process itself need not be witnessed. There is, furthermore, nothing said to inform the voter that his or her oath should be executed in the presence of the lay witnesses. To negate the votes of 35

individuals on the grounds that they did not meet requirements never made known to them or their witnesses would constitute disenfranchisement of a most egregious sort. Under these circumstances, the ballots of these individuals were properly counted.

In my view the Special Master's analysis is in accord with this court's voting decisions. In *Fischer v. Stout*,[1] we said:

> In *Willis* we upheld the decision of a master to count the votes of two voters whose names did not appear on the voters list because the registrars failed to send their registration applications to the Division of Elections. 600 P.2d at 1087. As in *Willis*, the error with regard to Ms. Munoz's application was 'solely on the part of the election officials.' *Id.* Her vote should have been counted.[2]

An additional point in *Fischer* concerned whether the ballot of Daryl Wallace should have been counted. In attempting to correct an error in the address given on his voter registration card, the voter checked the box cancelling his registration. In regard to the issue we said:

> Fischer argues that the voter registration card is confusing and that Mr. Wallace's ballot should have been counted. We agree....his vote should have been counted.[3]

Of additional significance is that portion of our decision in *Fischer v. Stout* where in connection with a name change issue we observed that:

> We will seek a construction of the phrase which avoids the wholesale disfranchisement of qualified electors. *See Carr v.*

*Thomas*, 586 P.2d 622, 626 (Alaska 1978)[4] (footnote omitted).

The authorities alluded to above are reflective of this court's recognition that the right to vote is a fundamentally important right.[5] Our own precedents are also in accord with the view that "[a]bsentee voting regulation should not be construed in a manner that unduly interferes with the exercise of this right by those otherwise qualified to vote."[6] In this regard the Supreme Court of Colorado further concluded that:

> Nor should the exercise of the voting right be conditioned upon compliance with a degree of precision that in many cases may be a source of more confusion than enlightenment to interested voters. A rule of strict compliance, especially in the absence of any showing of fraud, undue influence, or intentional wrongdoing, results in the needless disenfranchisement of absent voters for unintended and insubstantial irregularities without any demonstrable social benefit.[7]

Given the importance of the right to vote, and our decisions which have refused to disenfranchise voters due to mistakes of election officials, I conclude that the special master correctly upheld the director's decision to count these 32 disputed absentee ballots.[8] As the Special Master noted the lay witnesses were given unclear instructions concerning the witness certificate. Additionally, the instructions to the absentee voter were "actually misleading." In short, these inadequate directions failed to articulate the precise roles the voter and his or her witnesses were to play in the absentee voting process. Further, there is no indication in this record of fraud, voter

---

1. 741 P.2d 217, (Alaska 1987).

2. *Id.* at 225.

3. *Id.* at 224.

4. *Id.* at 225. In *Carr* this court noted:
 > Courts are reluctant to permit a wholesale disfranchisement of qualified electors through no fault of their own and '[where] any reasonable construction of the statute can be found which would avoid such a result, the courts should and will favor it.'

 586 P.2d at 626 (brackets in original) (quoting *Reese v. Dempsey*, 153 P.2d 127, 132 (N.M.1944)).

5. See also *Erickson v. Blair*, 670 P.2d 749, 754 (Col.1983). ("the right to vote is a fundamental right of the first order").

6. *Id.* at 754.

7. *Id.* at 754–55.
 The *Erickson* court went on to reject the rule of strict compliance and in turn adopted a standard of substantial compliance concluding that such standard "is adequate to the task of both preventing fraud in the elections and perserving the absent voter's right of suffrage against unnecessary and technical restrictions." *Id.* at 755.

8. See also *Application of Moore*, 57 N.J.Super. 244, 154 A.2d 631, 637–38 (1959).

coercion, intentional wrongdoing, or a pattern of similarity among the names of the witnesses who signed the witness certifications on these absentee ballots. In such circumstances I would not penalize the absentee voters for the failure of Alaska's election officials to furnish unambiguous instructions concerning the manner in which the absentee voter, and his or her two lay witnesses, were required to carryout their respective roles in the absentee voting process.[7]

---

7. Implicit in the resolution I would reach is my agreement with the state's contention that the requirements of AS 15.20.081(d) should be construed as directory, under AS 15.20.203(b)(2), for purposes of determining the consequences of any noncompliance on the part of lay witnesses in executing absentee voter certificates.